GAZIANO, J.
**337 *549 After being charged with misdemeanor breaking and entering and wanton destruction of property, M.C. was found incompetent to stand trial. He was committed temporarily to a psychiatric facility pending a civil commitment hearing, to be held pursuant to G. L. c. 123, § 5 ; during that time, M.C. was diagnosed as having schizophrenia. Although he sought to have it conducted at a court house, the hearing on M.C.'s civil commitment was held in a hearing room at the facility. Toward the beginning of the proceeding, the court-owned recording equipment malfunctioned. Two different alternate recording devices were used to record the remainder of the hearing, with the result that the transcript of the proceedings is in places incomplete. At the end of the hearing, M.C. was civilly committed for a period of two months. Ultimately, after an unsuccessful motion to vacate and a recommitment for an additional period of three months, he was released.
We are asked to determine whether conducting the hearing at the hospital rather than at a court house violated M.C.'s right to due process, particularly in light of the malfunctioning recording equipment. In addition, we must decide whether his right to due process was violated when the Appellate Division of the Boston Municipal Court denied M.C.'s motion to vacate the commitment order, in particular given the irregular recording procedures and the absence of a complete, verbatim transcript.
We conclude that the available transcript provides an adequate basis for appellate review and contains evidence sufficient to support M.C.'s involuntary commitment. On this record, we conclude that M.C. was not denied due process of law. At the same time, however, we emphasize that a judge presiding over a civil commitment hearing pursuant to G. L. c. 123, § 5, retains the discretion **338 to determine the location of the hearing on a case-by-case basis. All civil commitment hearings, wherever conducted, must be recorded and must operate as open, public proceedings. These protections are critical to ensuring that civil commitment hearings safeguard individuals' rights to due process and equal access to the courts.[1]
1. Background. The following facts are not disputed. In May 2016, M.C. was arraigned in the District Court on charges of breaking and entering and misdemeanor wanton destruction of property. He was released on personal recognizance. When M.C. appeared in court in August 2016, a competency hearing pursuant to G. L. c. 123, § 15 (a ), was ordered to determine whether M.C. was able to stand trial. That same day, the court ordered that M.C. be temporarily committed without bail and sent to the Worcester Recovery Center and Hospital for evaluation, pursuant to G. L. c. 123, § 15 (b ). Ultimately, M.C. was released with the condition that he abstain from drugs and alcohol and report to the probation department in person twice a *550 week. In late August 2016, he failed to report to the probation department, as was required under the terms of his release. When M.C. appeared in court in December 2016, on a default warrant, the court again ordered that he be evaluated pursuant to G. L. c. 123, § 15 (a ), for competency to stand trial. The defendant was found incompetent and was hospitalized at the Solomon Carter Fuller Mental Health Center (Solomon Carter), pursuant to G. L. c. 123, § 16 (a ).
In January 2017, M.C. again was found incompetent to stand trial. That same day, the Commonwealth filed a petition under G. L. c. 123, § 16 (b ), to extend the prior order of commitment. Later that month, a District Court judge yet again found M.C. incompetent to stand trial, further extended the order of commitment, and granted a request to change venue to the Boston Municipal **339 Court. Solomon Carter also filed a petition for authorization to treat M.C. medically (administer antipsychotics) pursuant to G. L. c. 123, § 8B, based on the prior diagnosis of schizophrenia. A commitment hearing was scheduled for later that month, within the statutorily mandated fourteen-day window.[2] See G. L. c. 123, § 7 (c ) ; Hashimi v. Kalil, 388 Mass. 607, 609-610, 446 N.E.2d 1387 (1983) (language of G. L. c. 123, § 7 [c ], is mandatory and jurisdictional). Two days before the hearing was to take place, M.C. filed a motion for a continuance. The motion was allowed, and the commitment hearing was rescheduled, to a date two days before the statutory deadline.
The day before the rescheduled hearing, M.C. filed a motion to conduct the hearing at the Boston Municipal Court rather than at Solomon Carter. See G. L. c. 123, § 5 ("The court may hold the hearing [at a court house or] at the facility or said hospital").[3] As grounds for the motion, M.C. asserted that civil commitment hearings implicate an important liberty interest; that he was aware of no other class of litigants for whom adjudicatory court hearings were "routinely held in a non-neutral, segregated court setting such as a psychiatric hospital"; that a respondent who seeks to have a hearing conducted at a court house "is merely asserting his right to stand on an equal footing with all other non-disabled litigants"; that "[e]qual access to the courts is guaranteed as a matter of both equal protection and the non-discrimination provisions of Title II of the Americans with Disabilities Act (ADA)"; and that "the recordings in most hospital hearings are not sufficiently complete or accurate to be transcribed." He did not file a request for an additional continuance and did not request to be heard on the motion. The Department of Mental Health (DMH) opposed M.C.'s motion on a number of grounds. It argued that holding the commitment hearing outside the facility would require special transportation for M.C. "at considerable time and expense" and that he "would pose a safety risk to himself and others" in transit to the court or in a holding cell at the court house. DMH also asserted that functioning digital recorders were available at the Solomon Carter facility and that **340 "there would be no barrier or hindrance to the Court being able to provide a full and accurate copy of the recording if it were requested." In addition, *551 DMC asserted that the ADA would not apply, and that, even if the ADA did apply, the safety requirements that were asserted with respect to the other claims were equally applicable to the ADA claim to prevent "harmful behavior [by M.C.] to himself or others." Noting that the "motion [was], inter alia, untimely," a judge of the Boston Municipal Court denied the motion.
The Boston Municipal Court judge conducted the hearing on civil commitment in a "hearing room" on the seventh floor of the Solomon Carter facility. In an affidavit, M.C.'s hearing counsel described the room as follows:[4]
"The room provided for the mental health proceeding contains two long rectangular tables for counsel, the respondent and the attending doctor which faced one long rectangular table where the judge sits. "There are 4-5 chairs lined up behind 'counsel tables,' a chair at the end of the judge's table for the clerk, and a chair approximately diagonal from counsel table where the court officer sits. There is an American flag behind the judge's table."
Initially, the hearing was recorded using a recording device whose batteries had not been replaced in some time. The recorder stopped functioning after the hearing began. When he learned of the equipment failure, M.C. moved orally that the remainder of the hearing be conducted at a court house. The motion was denied. Alternate devices then were used to record the majority of the hearing. These devices included an assistant clerk-magistrate's personal iPhone cellular telephone and a cassette tape recorder.
In combination, the substitute recording devices enabled production of a transcript detailing most, but not all, of the hearing, punctuated by some breaks and inaudible sections. The recorded portions of the hearing include the testimony of the sole witness (an inpatient psychiatrist on the inpatient unit at Solomon Carter);
**341 the parties' closing statements; and the judge's issuance of his ruling.
The inpatient psychiatrist testified that she had observed M.C. at Solomon Carter approximately five days per week. During this period, she saw him exhibit disorganized behavior, paranoia, and hallucinations. On four occasions, M.C. engaged in violent behavior that required physical and chemical restraints. M.C. was restrained on four different occasions after throwing a metal laundry hamper; punching a glass window; punching a glass window and kicking a door; and throwing a tray, spitting at staff, and attempting to assault a female patient. The psychiatrist testified that, on one occasion during his temporary commitment for evaluation, she noticed that M.C. had a black eye. When asked about the injury, M.C. explained that he had punched himself.
The psychiatrist testified also that, on one occasion, M.C. defecated on himself and then refused to shower. At other times, M.C. had "been throwing coffee and food on the walls of his room," and had "thrown coffee at the ceiling." The psychiatrist testified further that M.C. clogged his toilet with socks and towels; had "been spitting on the kitchen tables, where he knows other patients eat;" and "also [had]
*552 been spitting into his hand and rubbing the spigot that the water comes out of in our water fountain with the spit." At times, M.C. struggled with food and liquid intake. There was one thirty-eight-day period during which he did not shower. When repeatedly told to shower, M.C. informed staff members that he did not have a change of clothes. When staff members brought M.C. a change of clothes, M.C. "said that the pants were laughing at him."
Overall, the psychiatrist testified that, in her opinion, if M.C. were to be discharged on the day of the hearing, he would pose a substantial risk of harm to himself as a result of his mental illness. She based this opinion on M.C.'s demonstrated limited ability to care for himself, as evidenced by hygiene issues and poor oral intake. The psychiatrist testified further that M.C.'s attempts to assault a female patient and demonstrated history of throwing large objects would place other people in fear of serious physical harm. The psychiatrist did not believe that there was any less restrictive setting than inpatient hospitalization in which M.C. would not pose a substantial risk of serious harm to himself or others as a result of his mental illness.
At the close of the evidence, the judge found beyond a reasonable doubt that M.C. suffered from schizophrenia and that, if not committed, he would pose a significant, imminent risk of harm to **342 himself or to others. The judge ordered that M.C. be involuntarily committed to Solomon Carter for a period of two months, pursuant to G. L. c. 123, § 8. The judge noted that M.C. was "fearful" of taking medication because of a prior history of substance abuse, and accordingly, the judge took no action on the petition to treat M.C. with medication. M.C. filed a timely notice of appeal to the Appellate Division, under G. L. c. 231, § 108, and Rule 8C(b) of the District/Municipal Courts Rules of the Appellate Division of the District Court.
2. Postcommitment proceedings. After M.C.'s period of commitment expired, he filed a motion pursuant to Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974), for relief from the order of commitment. That motion was denied without a written opinion. The following day, a judge of the District Court dismissed the criminal charges against M.C. Thereafter, a Boston Municipal Court judge ordered that M.C. be civilly committed pursuant to G. L. c. 123, § 16 (c ), for a period not to exceed three months. Subsequently, M.C. filed a timely notice of appeal and an amended notice of appeal from the initial order of commitment and the denial of his rule 60 (b) motion.
M.C. was discharged in August 2017, before his appeal was heard. Asserting improper service of process and arguing that M.C.'s appeal was moot following his release, Solomon Carter moved to dismiss the appeal pursuant to G. L. c. 123, § 9A. After a hearing in September 2017, the Appellate Division of the Boston Municipal Court allowed Solomon Carter's motion to dismiss, on the ground that M.C.'s appeal was moot because the order of commitment had expired. In November 2017, M.C. filed a notice of appeal to the Appeals Court from the Appellate Division judgment. We granted direct appellate review.
3. Discussion.[5] a. Mootness. Solomon Carter argues that M.C.'s claims should be *553 dismissed as moot because the initial commitment **343 resulting from the February 2017, order expired after two months, and M.C. was recommitted in May 2017, and discharged three months later.
"[L]itigation is considered moot when the party who claimed to be aggrieved ceases to have a personal stake in its outcome." Seney v. Morhy, 467 Mass. 58, 61, 3 N.E.3d 577 (2014), quoting Blake v. Massachusetts Parole Bd., 369 Mass. 701, 703, 341 N.E.2d 902 (1976). Here, notwithstanding that he was discharged from Solomon Carter before his appeal was filed, and that he was recommitted to Solomon Carter on a subsequent occasion, M.C. retains a surviving interest in establishing that the February 2017, order of civil commitment was not lawfully issued. In the context of involuntary hospitalization, "[a]lthough an expired or terminated [commitment] order may no longer have operative effect, [an] appeal should not be dismissed without considering the merits of the underlying [commitment] order." Matter ofF.C., 479 Mass. 1029, 1030, 97 N.E.3d 333 (2018). This is because, "[a]t the very least, a person who has been wrongfully committed or treated involuntarily has 'a surviving interest in establishing that the orders were not lawfully issued, thereby, to a limited extent, removing a stigma from his name and record.'" Id. at 1029-1030, 97 N.E.3d 333, quoting Seney, supra at 62, 3 N.E.3d 577. The length of time for which an individual is committed is relevant to the stigma arising from that commitment. See Matter of E.A.L., 179 Or. App. 553, 556, 41 P.3d 440 (2002) ("the stigma that arises from commitment is a function not only of the fact of commitment but, also, of its duration"). Accordingly, the stigma occasioned by one involuntary commitment is not erased by a subsequent recommitment. Therefore, M.C.'s case is not moot, and we decide his claims on the merits.
b. Due process. M.C. asserts that his rights to a fair trial and appeal were violated when the Boston Municipal Court judge allowed the civil commitment hearing to proceed after learning of the malfunction of the recording device, thereby resulting in the use of irregular recording equipment and the consequent production of an incomplete transcript.
**344 We review the denial of a motion under Mass. R. Civ. P. 60 (b) for abuse of discretion. See Murphy v. Administrator of the Div. of Personnel Admin., 377 Mass. 217, 227, 386 N.E.2d 211 (1979) ("It is well established that denial of a motion under Rule 60 [b] will be set aside only on a clear showing of an abuse of discretion"). We conclude that the existing transcript demonstrates a sufficient basis for involuntary commitment, and that M.C.'s due process rights were not violated in this case. Accordingly, we affirm the denial of the motion to vacate the order of commitment, on different grounds.
*554 As we have observed, "commitment hearings have been increasingly clothed with the procedural protections and formality typical of other civil (and criminal) trials." Kirk v. Commonwealth, 459 Mass. 67, 72, 944 N.E.2d 135 (2011). "The provisions of G. L. c. 123 balance the rights of and protections for incompetent persons with the Commonwealth's interest in 'protecting the public from potentially dangerous persons' who may be unable to control their actions because of their mental condition." Matter of E.C., 479 Mass. 113, 119, 92 N.E.3d 724 (2018), citing Commonwealth v. Calvaire, 476 Mass. 242, 246, 66 N.E.3d 1028 (2017). Accordingly, where the prescribed procedures are followed, "an individual's due process rights ... are protected at a hearing under G. L. c. 123, §§ 7 and 8." Matter of E.C., supra at 121, 92 N.E.3d 724. The liberty interest at stake in a civil commitment proceeding is "massive." See, e.g., Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972) (confinement "for compulsory psychiatric treatment" entails "a massive curtailment of liberty").
An individual facing involuntary commitment under G. L. c. 123, §§ 7 and 8, has the right to notice and a hearing, the right to an attorney, the right to introduce evidence, the right to an independent medical evaluation, and the right to cross-examine witnesses. See G. L. c. 123, § 5 ; Matter of E.C., 479 Mass. at 121, 92 N.E.3d 724. Individuals do not, however, have a due process right to select the location of a judicial proceeding. See, e.g., Foley v. Commonwealth, 429 Mass. 496, 500, 709 N.E.2d 794 (1999) (where motion judge was authorized by statute "to adjourn the court, whenever the public convenience makes it expedient, to the Massachusetts Correctional Institution at Bridgewater," judge lawfully could hold arraignment sessions outside secured housing area of correctional facility without making formal findings of fact that public convenience requires such action); Commonwealth v. DeBrosky, 363 Mass. 718, 721, 297 N.E.2d 496 (1973) (to enable hospitalized witness to complete cross-examination, "[t]he judge had the authority to transfer **345 the trial to the auditorium of the hospital in the reasonable exercise of his discretion," over defendant's objection).
An individual subject to civil commitment proceedings under G. L. c. 123, § 16, "is entitled to a 'record of sufficient completeness to permit proper consideration of his claims [on appeal].' " Commonwealth v. Imbert, 479 Mass. 575, 577-578, 97 N.E.3d 335 (2018), quoting Mayer v. Chicago, 404 U.S. 189, 194, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971). See Standard 4:02 of the Standards of Judicial Practice: Civil Commitment and Authorization of Medical Treatment for Mental Illness (rev. Dec. 2011) (Standards of Judicial Practice) (commitment hearings must be recorded electronically on appropriate recording device, with recording made available to parties). Transcripts of civil commitment proceedings are useful for appellate review of questions related to the sufficiency of evidence, and to protections of due process rights. At the same time, it is well established that the right to a record of sufficient completeness "does not 'translate automatically into a complete verbatim transcript.' " Imbert, supra at 578, 97 N.E.3d 335, quoting Mayer, supra.
When portions of a transcript are unavailable or otherwise incomplete "through no fault of the parties," then "'rough accommodations' in the method in which an appeal is presented are constitutionally permissible." Commonwealth v. Harris, 376 Mass. 74, 77, 379 N.E.2d 1073 (1978). Alternatives to a complete verbatim transcript are "constitutionally adequate if they bring before the appellate court an *555 account of the events sufficient to allow it to evaluate the defendant's contentions." Id., citing Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). Furthermore, "[e]ven if a [party] asserts an appellate claim which requires recourse to a transcript, he is not necessarily entitled to the full transcript." Bundy v. Wilson, 815 F.2d 125, 135 (1st Cir. 1987).
We consider the existing record in this case as sufficient to permit appellate review and to enable proper disposition of M.C.'s appeal. There is "enough in the record pertinent to the point to enable us to decide [this appeal] without resort to speculation." Commonwealth v. Bottiglio, 357 Mass. 593, 597, 259 N.E.2d 570 (1970). The existing record supports the motion judge's finding of proof beyond a reasonable doubt that M.C. was mentally ill and that, as a result of his mental illness, "the discharge of such person from a facility would create a likelihood of serious harm." See Newton-Wellesley Hosp. v. Magrini, 451 Mass. 777, 780 n.8, 889 N.E.2d 929 (2008), quoting G. L. c. 123, § 8 (a ). See also Superintendent of Worcester State Hosp. v. Hagberg, 374 Mass. 271, 276, 372 N.E.2d 242 (1978) (standard of proof **346 beyond reasonable doubt of likelihood of serious harm is required in cases of civil commitment for mental illness under G. L. c. 123, § 16 [b ] ).
The record also contains sufficient evidence to support the psychiatrist's conclusion that M.C.'s release could pose an imminent risk of danger, based on his repeatedly demonstrated use of physical force against others and himself. See Commonwealth v. Nassar, 380 Mass. 908, 917, 406 N.E.2d 1286 (1980) (" 'Immediacy' is linked to the requirement of an enhanced standard of proof in the sense that the forecast of events tends to diminish in reliability as the events are projected ahead of time"). See also Matter of G.P., 473 Mass. 112, 128, 40 N.E.3d 989 (2015) (in context of G. L. c. 123, § 35, "what must be shown is a substantial risk that the harm will materialize in the reasonably short term -- in days or weeks rather than in months").
Finally, the evidence at the hearing also was sufficient to support the judge's determination that "no less restrictive alternative to hospitalization is appropriate." Newton-Wellesley Hosp., 451 Mass. at 780 n.8, 889 N.E.2d 929, citing Nassar, 380 Mass. at 917-918, 406 N.E.2d 1286. See Nassar, supra (in context of civil commitment proceedings, all parties should aim "to find the least burdensome or oppressive controls over the individual that are compatible with the fulfilment of the dual purposes of our statute, namely, protection of the person and others from physical harm and rehabilitation of the person").
Overall, the available record demonstrates the existence of sufficient evidence to commit M.C. involuntarily pursuant to G. L. c. 123, § 16 (b ).[6]
We do not agree with M.C.'s assertion that the motion judge committed legal error in denying M.C.'s motion under Mass. R. Civ. P. 60 (b) for relief from judgment after the judge learned that M.C. had not received a verbatim transcript of the civil commitment hearing.
Here, the incomplete transcript resulted from an equipment malfunction that was not the fault of either party. As the motion judge noted, even court houses equipped with new recording systems occasionally experience recording equipment *556 malfunctions. Generally, a party seeking to reconstruct proceedings must seek relief in the court where the proceeding took place, and "where **347 [the party] may try to reconstruct the trial proceedings in a manner that will be sufficient for [the party] to present his [or her] claims on appeal." See Drayton v. Commonwealth, 450 Mass. 1028, 1029, 879 N.E.2d 1240 (2008), citing Harris, 376 Mass. at 79, 379 N.E.2d 1073. Here, M.C. did not file any pleading under Mass. R. A. P. 8 (e), as amended, 378 Mass. 932 (1979), in order to correct the record before the motion judge. See Commonwealth v. Woody, 429 Mass. 95, 98, 706 N.E.2d 643 (1999) ("Gaps or inaudible portions of a tape recording are most closely governed by Mass. R. A. P. 8 [e] .... [T]he appellant may determine if the omissions are material, in which event the appellant has the burden to settle the record as provided in Mass R. A. P. 8 [c] and [e]"). This clearly is not a case in which the "proceedings cannot be reconstructed sufficiently to present the [petitioner's] claims." See Imbert, 479 Mass. at 578, 97 N.E.3d 335, quoting Harris, supra at 78, 379 N.E.2d 1073. Indeed, the motion judge underscored that he "know[s] how easy it is to get responsible lawyers and a judge to reconstruct a three- to four-week trial, let alone an hour-long hearing."
Here, the record is adequate to determine the merits of the underlying issue, in other words, to provide the defendant and his counsel a sufficient record upon which to challenge the findings and rulings. Neither party disputes the validity of the transcription of the testimony that actually was recorded, and M.C. does not assert an effort at deliberate concealment of a portion of the proceedings. Beyond pointing out the existence of gaps in the recording, M.C. does not establish how the unrecorded content prejudiced him in the context of these proceedings. There is no dispute as to the existence of a twenty-minute unrecorded segment of the hearing. With respect to this unrecorded segment, however, Solomon Carter agrees that "there is no controversy over the items M.C. identifies as missing." Solomon Carter also "agrees that M.C.'s objection to continuing the hearing [is] preserved." The existence of other gaps and pauses noted on the transcript do not outweigh the strength of the testimony that was recorded, or the validity of the result to be drawn from it.
We discern no error in the Appellate Division's conclusion that the steps taken by the motion judge to initiate backup recording of the hearing were "appropriate and reasonable."[7] The judge acted within his discretion to continue the hearing using alternate **348 recording devices, which he believed in good faith were "effective" and "adequate," and therefore would produce an accurate recording. We defer to the motion judge's finding that all recording devices were used with his knowledge and authority. Accordingly, we reject M.C.'s argument that the recording devices were "unofficial" within the meaning of Special Rule 308(B) of the Boston Municipal Court Department Sitting for Civil Business (1989). As the judge explained at the hearing on M.C.'s motion:
"When it was discovered by the clerk, who alerted me, that the new digital recording recorder was not operating, the supplementation of that device, first by the iPhone and then by the cassette recorder, both were done openly and *557 with the sole intent to see to it that the proceeding was substantially recorded as best as possible under the circumstances."
The judge further explained that the clerk-magistrate had used his iPhone at the initial commitment hearing "with [the judge's] authority, in an attempt to keep the hearing progressing," and only "because the primary device to record the proceedings had failed."
c. Open proceedings. There is no evidence in the record to indicate that members of the public were prevented, or would have been prevented, from attending the civil commitment hearing. There is, however, some suggestion of a misconception that civil commitment proceedings are by nature closed and hidden from public view.[8] Because the liberty interests at stake in civil commitment proceedings are great, we exercise our discretion to address questions related to the open nature of civil commitment proceedings under G. L. c. 123, § 16. We affirm today that civil commitment proceedings under G. L. c. 123, § 16 (b ), are presumptively **349 open to the public.[9]
In Kirk, 459 Mass. at 68, 944 N.E.2d 135, this court held that "recommitment proceedings pursuant to G. L. c. 123, § 16 (c ), are presumptively open to the public." We noted the "likely beneficial effects of public access to such proceedings." Id. at 73, 944 N.E.2d 135. We also noted that " G. L. c. 123, §§ 5 and 16, the provisions governing commitment hearings and the commitment of those not guilty by reason of mental illness, with which we are concerned, do not speak of closure." Id. at 75, 944 N.E.2d 135. While our holding in Kirk, supra at 73 n.9, 944 N.E.2d 135, was "limited to the question of closure as it regards G. L. c. 123, § 16 (c )," both parties read that case to indicate that civil commitment proceedings more broadly are presumptively open to the public. Indeed, after our decision in Kirk, the District Court issued revised standards of judicial practice interpreting Kirk to suggest that the rule of presumptive openness "should be applied in all civil commitment proceedings for mentally ill persons." See Standard 4:01 & commentary of the Standards of Judicial Practice. We clarify our endorsement of the District Court's interpretation. "Openness ... enhances both the basic fairness of the [proceeding] and the appearance of fairness so essential to public confidence in the system." Foley, 429 Mass. at 499, 709 N.E.2d 794, quoting Press-Enter. Co. v. Superior Court, 478 U.S. 1, 13, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). "The physical layout of the place in which the [proceedings] are held and its accessibility to the public are important considerations in deciding whether the proceedings conducted there are properly public." Foley, supra.
d. Superintendence authority. At present, the Boston Municipal Court and District Court standards of judicial practice *558 imply a preference for holding civil commitment proceedings in health care facilities rather than at court houses. Those courts' Standards of Judicial Practice for Civil Commitment and Authorization of Medical Treatment for Mental Illness provide that
"[h]earings may be conducted away from the courthouse and at the petitioning mental health facility or Bridgewater State Hospital. G. L. c. 123, § 5. Normally it is desirable to do so if appropriate decorum, security, recordation and public access are available."
**350 Standard 4:00 of the Standards of Judicial Practice. Notwithstanding this section of the guidelines, G. L. c. 123, § 5, requires no such baseline preference for holding hearings at mental health facilities over court houses.[10]
General Laws c. 123, § 5, authorizes, but does not require, a motion judge to conduct civil commitment hearings under G. L. c. 123, §§ 7 and 8, at a mental health facility rather than at a court house. General Laws c. 123, § 5, provides a judge with flexibility to determine the location of a civil commitment hearing under G. L. c. 123, §§ 7 and 8. The statute obligates the court to provide "[n]otice of the time and place of [the] hearing ... to the department, the person, his counsel, and his nearest relative or guardian," G. L. c. 123, § 5, and states that "[t]he court may hold the hearing at the facility or said hospital," id. "The use of the word 'may' in a statute is generally permissive, reflecting the Legislature's intent to grant discretion or permission to make a finding or authorize an act." Commonwealth v. Dalton, 467 Mass. 555, 558, 5 N.E.3d 1206 (2014). "It is axiomatic in statutory construction that the word 'shall' is an imperative and that the word 'may' does not impose a mandate but simply authorizes an act." School Comm. of Greenfield v. Greenfield Educ. Ass'n, 385 Mass. 70, 81, 431 N.E.2d 180 (1982). Accordingly, we emphasize that, under G. L. c. 123, § 5, a judge presiding over a civil commitment hearing retains discretion to determine the location of the hearing on a case-by-case basis. The language of G. L. c. 123, § 5, does not express a preference for any particular location. Irrespective of the location where a hearing may be held, as the Standards of Judicial Practice rightfully note, "appropriate decorum, security, recordation and public access" are required for such hearings, wherever they occur. See Standard 4:00 of the Standards of Judicial Practice.
Ensuring adequate protection of due process rights of all individuals subject to civil commitment hearings is necessary to "the furtherance of justice, the regular execution of the laws, the **351 improvement of the administration of such courts, and the securing of their proper and efficient administration." See G. L. c. 211, § 3. In order to safeguard the due process rights of individuals subject to possible civil commitment, civil commitment proceedings pursuant to G. L. c. 123, § 16, must be recorded adequately. It also must be made clear to judges presiding over civil commitment hearings that G. L. c. 123, § 5, expresses no preference with respect to the *559 location where civil commitment hearings are held, but, rather, accords the judge discretion.
We expect that the Chief Justice of the Boston Municipal Court and Chief Justice of the District Court will modify, as appropriate, the Boston Municipal Court and District Court Standards of Judicial Practice for Civil Commitment and Authorization of Medical Treatment for Mental Illness in accordance with this decision, paying special attention to ensuring that civil commitment hearings are open to the public and are adequately recorded.
Judgment affirmed.

We acknowledge the amicus briefs of Aaron Needle, Benjamin Levy, the Western Massachusetts Recovery Learning Community, and the National Association for Rights Protection and Advocacy; the Massachusetts Psychiatric Society, Inc., Massachusetts Association of Behavioral Health Systems, Massachusetts Hospital Association, and Massachusetts Ambulance Association; Wayne Ramsay on behalf of the Law Project for Psychiatric Rights, Inc.; Thomas F. Schiavoni; the Judge David L. Bazelon Center for Mental Health Law, the American Association of People with Disabilities, the Association of University Centers on Disabilities, and the National Council on Independent Living; and the Committee for Public Counsel Services, Center for Public Representation, Mental Health Legal Advisors Committee, and Disability Law Center.

General Laws c. 123, § 7 (c ), provides in part: "The hearing on a petition brought for commitment pursuant to [§ 15 (e ) ] and [§§] 16 and 18 ... shall be commenced within [fourteen] days of the filing of the petition, unless a delay is requested by the person or his counsel."

It is not disputed that the Solomon Carter Health Center is a "facility" within the meaning of G. L. c. 123, §§ 1 and 15 (b ).

In his brief, M.C. argues that the hearing room environment was "inadequate," but does not specify his concerns with respect to the room itself. We note that, to the extent described in an affidavit by a mental health attorney, the layout described appears to conform largely to standards propagated by the District Court. See Standard 4:00 & commentary of the Standards of Judicial Practice: Civil Commitment and Authorization of Medical Treatment for Mental Illness (rev. Dec. 2011).

M.C. contends, without reference to any supporting authority, that holding his civil commitment hearing at Solomon Carter rather than a court house denied him the equal protection of the laws under the United States and Massachusetts Constitutions. We are unaware of any authority that suggests that an individual has an equal protection right to select the physical location of a commitment hearing, and we note that the statute explicitly contemplates hearings in a hospital. See G. L. c. 123, § 5. In any event, the record does not contain sufficient factual information to enable us to address an equal protection argument. "Where constitutional questions and matters of asserted public policy are raised, it is preferable to pass on the issues in light of a fully developed trial record rather than, as here, in the abstract." Doe v. Doe, 378 Mass. 202, 203, 390 N.E.2d 730 (1979). See McSweeney v. Cambridge, 422 Mass. 648, 655, 665 N.E.2d 11 (1996) (not deciding equal protection claim due to insufficient record). Although we do not agree with Solomon Carter's contention that the issue is waived because it was not raised in the trial court, we also do not address M.C.'s Federal claim that the decision to hold the civil commitment hearing at Solomon Carter's facility rather than at a court house violated his rights under the Federal Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq., owing to an incomplete record with respect to this issue.

The standard of proof under the Massachusetts Constitution is higher than the minimum standard of "clear and convincing" evidence under the United States Constitution. See Addington v. Texas, 441 U.S. 418, 433, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

M.C. also argues that the four cassette tapes he received containing audio recordings of the hearing do not qualify as "a cassette copy of an original recording, or any portion thereof," of the hearing on the petition for civil commitment, as provided by Special Rule 308(A)(5)(a) of the Boston Municipal Court Department Sitting for Civil Business (1989). This distinction, however, is immaterial.

During the April 2017 hearing on M.C.'s motion under Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974), months after the civil commitment hearing, the motion judge communicated his understanding as follows:
"These proceedings are not open to the public. They are held here in a hearing[ ] room in the hospital where the public generally cannot walk into. They are conducted generally with the patient, attorneys, family members and needed security and medical personnel present."
As noted supra, civil commitment proceedings under to G. L. c. 123, § 16 (b ), are presumptively open to the public.

At the same time, "[a]s is the case in criminal trials, the right of the public to attend the hearings is not absolute. See Kirk v. Commonwealth, 459 Mass. 67, 73, 944 N.E.2d 135 (2011), citing Commonwealth v. Cohen (No. 1), 456 Mass. 94, 107, 921 N.E.2d 906 (2010).

General Laws c. 123, § 5, provides, in relevant part:
"Whenever the provisions of this chapter require that a hearing be conducted in any court for the commitment or further retention of a person to a facility or to the Bridgewater state hospital or for medical treatment including treatment with antipsychotic medication, it shall be held as hereinafter provided.... Notice of the time and place of hearing shall be furnished by the court to the department, the person, his counsel, and his nearest relative or guardian. The court may hold the hearing at the facility or said hospital."